FLYNN, Respondent, v. ST. LOUIS TRANSIT COM- PANY, Appellant.

St. Louis Court of Appeals, May 16, 1905.

1. **CARRIERS OF PASSENGERS:** Assault Upon Passenger. Where the conductor operating a street car assaulted a passenger and continued the assault in the street, after the passenger had alighted, the street railway company was liable for the injuries inflicted after the passenger left the car, as well as those inflicted before.

2. **PRACTICE:** Instruction: Credibility of Witnesses. Where an instruction was given, telling the jury in the usual form that they were the sole judges of the credibility of the witnesses and they had a right to consider the interest of the witnesses, their

demeanor, on the stand, etc., it was not reversible error to strike out a portion of the instruction to the effect that if the jury believed any witness had knowingly testified falsely they were at liberty to disregard any part of the testimony of such witness; because the giving of such instruction is largely within the discretion of the trial court and it is probable they would understand the remaining part of the instruction to give them that liberty.

3. ———: ———: **Assuming Fact.** It is not error to refuse instructions based on a hypothesis not warranted by the evidence.

4. ———: ———: ———. Nor is it error to refuse an instruction which assumes the existence of a fact not in evidence.

Appeal from St. Louis City Circuit Court.—*Hon. Robt. M. Foster,* Judge.

AFFIRMED.

*Boyle, Priest & Lehmann, Geo. W. Easley* and *Geo. T. Priest* for appellant.

(1) The trial court ought to have sustained the demurrer to plaintiff's evidence. The evidence disclosed the fact that the injuries which the plaintiff received were occasioned by the defendant's agent, after the relation of passenger and carrier had ceased between the plaintiff and defendant, and were also a result of an independent set of acts wholly without the scope of the conductor's employment. Lynch v. Railroad, 10 Am. Neg. 257; Farber v. Railroad, 32 Mo. App. 381; McKeon v. Railroad, 42 Mo. 83; Snyder v. Railroad, 60 Mo. 419; Farber v. Railroad, 116 Mo. 81, 22 S. W. 631. (2) This company cannot be made to account for all the vagaries of human character, especially under strained conditions. When the plaintiff was upon the street, the relation of passenger and carrier ceased, and defendant owed him no further duty as a carrier, and what the conductor thereafter did was not done in behalf of defendant. Railroad v. Boddy, 103 Tenn. 666; Dolan v.

Hubinger, 6 'Am. Wes. 506. (3) The verdict was against the weight of the evidence, and showed that the jury was moved through compassion and sympathy for the plaintiff. Where the verdict is manifestly against the weight of the evidence it is the imperative duty of the trial court to set it aside; and the trial court failing to do this, an appellate court will reverse the cause because of the abuse of discretion in the trial court, and because the verdict was a result of passion, prejudice or gross ignorance. Price v. Evans, 49 Mo. 396; Shohn v. Railroad, 87 Mo. 74.

*Seneca N. & S. C. Taylor* and *Bert F. Fenn* for respondent.

(1) The carrier's obligation is not only to carry his passengers safely and properly, but also to treat them respectfully. He must not only protect them from violence from strangers and other passengers, but must *a fortiori* against the violence of his own servants. Goddard v. Railroad, 57 Me. 202; Railroad v. Bleaker, 27 Md. 277; Shirley v. Billings, 8 Bush (Ky.) 147; Railroad v. Dunn, 19 Bush (Ky.) 162; Bryant v. Rich, 106 Mass. 184; Day v. Owen, 5 Mich. 520; Bass v. Railroad, 36 Wis. 415; Croker v. Railroad, 36 Wis. 657; Hanson v. Railroad, 62 Me. 84; Skipper v. Mfg. Co., 58 N. Y. 143; Rounds v. Railroad, 64 N. Y. 134; Railroad v. Kirk, 102 Ind. 399; Winnegar's Admr. v. Railroad, 85 Ky. 547; Railroad v. Flexman, 103 Ill. 546; Palmyra v. Railroad, 133 N. Y. 261; King v. Railroad, 69 Mass. 245; McKinley v. Railroad, 44 Iowa 245; Wise v. Railway, 13 Ky. 101; Light & Power Co. v. Mullin, 138 Ala. 614; American Railroad Law, (Baldwin) 320; 2 Wood on Railroads (2 Ed.), page 1378; Hutchinson on Carriers, 595. (2) Defendant's relation as carrier, to plaintiff did not end the moment the conductor forcefully threw him from the car; but it continued to exist while plaintiff was attempting to get his umbrella from

the rear platform of the car, immediately after he was thrown from the car. Daniel v. Railroad, 117 N. C. 592; Railroad v. Batchler (Tex. Civ. App.),73 S. W. 981; Railway v. Humphreys (Tex. Civ. App.), 62 S. W. 791; Railway v. Dick, 63 S. W. 895; Hardin v. Railway, 77 S.. W. 431; Railroad v. Schmelling, 197 Ill. 619; Wise v. Railway (Ky.), 34 S. W. 894; Railroad v. Bryan, 86: Ga. 312; Elliott on Railroads, sec. 1592. (3) An instruction should not be given where the hypothesis contained in it is not warranted by the evidence. White v.. Chaney, 20 Mo. App. 390; Ross v. Alleman, 60 Mo. 268; Railway v. Railway, 118 Mo. 625; McCarthy v. Fagin,. 42 Mo. App. 619.

## STATEMENT.

The suit is to recover damages caused by an alleged assault and battery made on plaintiff by a conductor in charge of one of defendant's street cars running on Broadway, in the city of St. Louis, at a time when plaintiff was a passenger on said car. Exemplary damages: were also prayed for.

The answer was a general denial and the following affirmative defense:

"And for further answer and defense, defendant says that just immediately before the alleged assault complained of by plaintiff, the plaintiff struck at and assaulted the conductor on said car, whereupon the conductor, in necessary defense of his own person, quietly removed plaintiff from said car, using no unnecessary force in so doing. That in so doing the conductor was: acting in defense of his own person and for his own protection, and was not acting in the discharge of any duty within the scope of his employment for defendant."

The new matter in the answer was put at issue by a reply.

Plaintiff testified that he had been in the employ of the St. Louis Transfer Company for forty years, and on.

August 17, 1904, he went from his place of employment to his home for his noon meal; that about one o'clock p. m. he boarded a Broadway car traveling south to be carried to Spruce street on Broadway, where the headquarters of the Transfer company are located. Plaintiff testified that he paid his fare and when the car was approaching Spruce street rang the signal bell to be let off at that street and then left his seat and went to the rear platform to be ready to step off as soon as the car was stopped but that the car did not stop. Plaintiff further testified as follows: "I turned around to the conductor, he was at my side, and I turned around to him and said, 'Why didn't you stop the car and let me off.' 'Well,' he said, 'I gave that fellow the bell.' I said, 'Give the bell again and let me off.' He muttered something I did not understand, but he did not give the conductor the bell nor stop the car, so when we got to Valentine street, which is the next street south, and the car did not stop, I reached my hand up and rang the bell, and as soon as I done that he grabbed my hand and pulled it back quite violently. I tried to get my hand away from him and he grabbed me around the body, grabbed my hands around my body and whirled me around. I tried to extricate myself out of his grasp, and we struggled on the platform for a little while, and anyhow, when he got me around in front of the steps, he put both hands to me and flung me clean off on the granite pavement, and I struck the pavement kind of sideways. I was cut in two places in the forehead, and then the third along the cheek bone here. After I got up, after he threw me off and I looked around, I noticed that the car was a little south of where I was, where he threw me off and my umbrella was lying over on the platform right along side of him, so I went back to get my umbrella and reached and got hold of the end next to me, he got hold of the opposite end and tried to keep me from getting it and we took a little while and then he let go of the umbrella and kicked me right in the groin; he kicked me with all the force he pos-

sibly could, I think. I had the umbrella in my hand and I made a lick with my umbrella at him, and I think I hit him in the face; then I turned around and walked away. I was going up toward the sidewalk and he overtook me; my back was to him and he overtook me and commenced again with all his might, hitting me right and left." ' Plaintiff also testified that the cuts were bleeding and he was quite bloody.

In respect to the injury the following appears in plaintiff's evidence:

"Q. Now, tell the jury when he kicked you in the groin and testicle how it felt, whether it gives you pain, and if so, how much? A. It pains me very severe of course.

"Q. Now, tell the jury how you felt the next day where he had kicked you; tell what pained you on the next day? A. I felt sore the next day and feel sore yet; I feel very sore because one of my testicles is broken, one is broken and all swelled and then it affects my kidneys or my bladder.

"Q. How did it affect your bladder? A. Well, it affected me so that I have to make water; I have to make water very often.

"Q. How often in the night? A. Well, I timed myself for four nights in succession.

"Q. What? A. I timed myself for four nights in succession one night after the other and I had to get out of bed from seven to nine times during bedtime.

"Q. Did you have that trouble before you were kicked? A. No, sir; never, never did. Never had any trouble before.

"Q. Now, you made a statement that one of your testicles was affected, tell how it is affected, tell how the injury developed if you can? A. Well, it got so swollen, all swollen.

"Q. How large did it become? A. Oh, it got probably about three times its natural size.

"Q. How long did it stay in that condition, if you know? A. Oh, it is in that condition yet.

"Q. Well did you have any operation upon it? A. Well, Dr. Robertson he operated upon me, he tapped it and got quite a lot of matter out of it."

Dr. David M. Gibson testified that he had examined the plaintiff on several occasions and that his last examination was made a few days before the trial. In regard to the injury, the following is taken from his testimony:

"Q. Well, you state what condition you found his testicles? A. He has an injury to the— he has an enlargement of the left testicle and quite an enlargement of the scrotum.

"Q. What is the scrotum? A. The sack.

"Q. State how large the left testicle is compared with the right? A. I think the testicle itself is perhaps twice the size of the other. There is a good deal of fluid and thickened tissue around it that makes it pretty hard to tell exactly the size of the gland itself; the gland, I think, is twice the size of the other one.

"Q. But take the fluid around it that fills that sack how much larger is that than the right sack? A. Well, perhaps two or three times the size.

"Q. How much larger than the right? A. Four or five times. There does not seem to be any enlargement of the tissue on the left side at all.

"Q. On the left side? A. On the left side, the gland is enlarged and also the tissue around it seems to be,—

"Q. Is it in a healthy or unhealthy condition? A. Unhealthy, so far as I can judge.

"Q. Did you make any examination of the condition of his bladder, the neck of the bladder? A. It is not so much the trouble with the bladder itself as with the neck of the bladder or the urethea of the bladder.

'Q. What effect does tenderness have upon that urethea? A. There is loss of control, it lessens the con-

trol and makes a person desire to urinate more frequently than normal.

"Q. Suppose Mr. Flynn, up to the thirteenth of May, 1903, had been in perfect health in regard to his testicle and neck of the bladder, and suppose that he had a serious kick against the testicle, scrotum, and in the region of the groin, and suppose after that the testicle should be abnormally swollen and continue in that condition right on down to the present time, state whether or not a kick such as has been described would be a cause to produce that injury? A. It could do it.

"Q. Would it be likely to do it? A. Yes, it would.

"Q. And suppose there was no other cause to produce that, and if that swelling of the left testicle continued, followed by tenderness of the bladder which compelled him to urinate very frequently, would you say from a medical standpoint that was cause to produce that injury? A. Yes, it would be reasonable to suppose that it did produce it."

Dr. V. P. Blair also testified in the case. The following is found in his evidence:

"Q. Now, concerning a man who gets to be seventy years old, it is not an unusual thing for him to have to get up four or five times during a night, is it? A. No, not at all; nothing unusual.

"Q. It is not unusual for the bladder to be more or less tender? A. It is very common, most men have it. . . . .

"Q. Would you say the injury would be any part of the procuring cause to urinate so frequently? A. There would be a probable sequence.

"Q. What do you mean by a probable sequence? A. You stated if a man is kicked in the scrotum and injured in the neck of the bladder, but I don't know how he could be injured in the neck of the bladder.

"Q. Why? A. Why the neck of the bladder is situated higher up, so that the probabilities are that the

injury could not have reached it. A kick in the scrotum would not injure the neck of the bladder.

"Q. Would the injury to the scrotum itself, the upper part of the scrotum, cause a tendency to frequently urinate? A. It might possibly in an old man.

"Q. Well, I am dealing with probabilities; would it probably have? A. A kick in the scrotum?

"Q. Yes. A. I do not see why it should probably have that tendency in itself.

"Q. Well, suppose an old man, such as I have suggested, being normal in regard to the times he would urinate in the night; . . . or occasionally getting up once or twice in the night and other times not at all in the night to urinate, kicked in the scrotum and receives injury which causes a serious swelling, and suppose after that he finds himself in a condition where he is compelled to get up and urinate, say from seven to nine times a night right along, would you say that the injury would be any part of the procuring cause of his being compelled after the injury to urinate so frequently? A. I say in all probability it was.

"Q. And to what would you attribute it, the medical term; I want to know why you say probably as the cause? A. I would say in answer to the hypothetical question simply it followed the injury; that is the only reason from the hypothetical question, following the injury that condition— probably that was the case. That is following your question as close as I can get at it."

Plaintiff introduced several bystanders as witnesses, who testified that the conductor pushed the plaintiff off the car, but that plaintiff did not fall but alighted on his feet and immediately turned to get his umbrella, which was lying on the platform of the car, and as he got hold of it the conductor kicked him; that plaintiff then struck the conductor with his umbrella and the conductor jumped off the car and followed plaintiff in

the street, striking him with his fist and continuing to do so until someone interfered.

In respect to the causes and extent of plaintiff's injuries, the defendant offered countervailing evidence. The conductor testified that when the car was near Clark avenue a bell was given to stop at that street but the car was too near to make the stop, and after passing it he gave the motorman a bell to stop at the next (Spruce) street, that the car was slowed up and plaintiff came out "and grabbed hold of the rope and gave two bells and the motorman released the brake and started on again and I took this man by the shoulder and pulled him back and said: 'Don't do that.' He turned around and struck at me and I shoved his licks off and told him, 'You are too old a man to fight and do not start anything here,' and I caught him by each wrist and held until the car stopped at Valentine street and led him over to the step, holding his arm all the time until his feet were on the street, and I turned him loose' and someone made the remark, 'give him his umbrella!' It was lying on the platform and I picked the umbrella up and handed it to him, and just as he got hold of it he struck me with the butt end in the temple, a hard lick." The conductor also testified that he then kicked the plaintiff, but not in the groin, jerked the umbrella out of his hands, followed him into the street and struck at him several times with his fist but reached him only once, and then with a glancing blow. The conductor was corroborated as to what transpired on the car by several other witnesses.

The verdict was for plaintiff for three thousand dollars actual and one thousand dollars punitive damages. After taking the usual steps, defendant appealed.

BLAND, P. J. (after stating the facts).—1. Defendant moved for a compulsory nonsuit. The refusal of the court to grant this motion is assigned as error. The contention is that the plaintiff's injuries were in-

flicted by the conductor after the relation of carrier and passenger, as between plaintiff and defendant, had terminated. The evidence of plaintiff tends to show that the plaintiff was first assaulted by the conductor while he was on the car and was pushed or thrown off the car, and that the assault was unprovoked. This evidence of itself justified the court in refusing a compulsory nonsuit. It is true, as contended by defendant, that the evidence shows the principal injury to plaintiff was caused by the kick, and that plaintiff was off the car and in the street when the kick was administered. But plaintiff's evidence tends to show that he did not leave the car voluntarily but was pushed off by the conductor and that his umbrella was still on the platform, and he was kicked while attempting to take his property from the car. In these circumstances it cannot be said that plaintiff's status as a passenger had entirely ceased and that defendant had discharged its whole duty to him by seeing him safely off the car. The evidence shows that the difficulty was begun on the car and that plaintiff was first assaulted by the conductor while he was a passenger on the car; and the time between the first assault and the ending of it in the street, when the conductor was induced to desist from beating the plaintiff, is too inappreciable to split the transaction into two parts. The evidence tends to show the wrong was a continued one. Nor do we think the evidence shows that plaintiff had entirely ceased to be a passenger at the time he was kicked. Plaintiff had the unquestionable right to take his umbrella from the car, and having been pushed from the car without it he had the right to return for it.

In Ormond v. Hayes, 60 Tex. 180, it was held: "The relation of carrier and passenger does not necessarily cease where the later alighted from the car and still aids the carrier's servants in removing his baggage from the car."

In Chicago Terminal R. R. Co. v. Schmelling, 197 Ill. l. c. 629, quoting from 4 Elliott on Railroads, sec-

tion 1592, and Pennsylvania Co. v. McCaffrey, 173 Ill. l. c. 173, the court said:

"This relation between a passenger and a railroad company does not cease upon the arrival of a train at the place of the passenger's destination, but the company is still bound to furnish him an opportunity to safely alight from the train. It is its duty, not only to exercise a high degree of care while the passenger is upon the train, but also to use the highest degree of care and skill, reasonably practicable, in providing the passenger a safe passage from the train."

In Houston & T. Cent. R. Co. v. Batchler, 73 S. W. (Tex) 981, it is said: "The relation of carrier and passenger continues not only until the passenger has left the car, but until he has left the station, or until a reasonable time has been given him to leave the premises."

In Savannah Railroad Co. v. Bryan, 86 Ga. 312, Bryan, a passenger, was kicked off the car by the conductor. Bryan then immediately repaired to the office of the company for the purpose of making complaint to the superintendent. He reached the office in eighteen or twenty minutes. The conductor arrived at or about the same time and again kicked him and hit him with his fists and cut him with a knife. It was held that the company was liable for both assaults.

In Wise v. Covington and Cincinnati Street Railway Company, 91 Ky. 537, it was held: "Where a passenger on a street car leaves the car because he is insulted and abused by the driver, and is pursued and beaten by the driver in the street, it must all be regarded as one continuous wrong, and the railway company is as much liable as if the beating had taken place in its car."

2. Defendant asked the following instruction:

"The jury are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In determining as to this, you have a right to consider the interest of the witness, if any, in the result of the suit, his manner on the witness stand, the proba-

bility or improbability of the matters to which he testified and all the facts and circumstances surrounding him. And if you believe that any witness has knowingly testified falsely as to any material fact in this cause, you are free to disregard the whole or any part of the testimony of such witness."

The court modified the instruction by striking out the last clause, and gave it thus modified. Defendant contends that the instruction should have been given as asked. No witness was impeached by evidence of his bad character for truth or veracity or by showing that he had made statements out of court inconsistent with his evidence. It is true there was a good deal of conflict in the evidence and the court would have been justified in giving the instruction as asked, but in view of what was given touching the duty of the jury in weighing the evidence and in passing on the credibility of witnesses, we do not think it was reversible error to refuse to instruct the jury that if it believed any witness had knowingly testified falsely to any material fact in issue, it was at liberty to disregard the whole or any part of the testimony of such witness. Experience teaches that such a direction to an intelligent jury is comparatively useless, for if the jury believe a witness has willfully testified falsely to any material fact in issue, it will, if he is not corroborated, without any instruction from the court, disregard his entire evidence when it comes to make up its verdict. The giving or refusing of such an instruction rests very largely in the discretion of the trial court (State v. Hickman, 95 Mo. 322, 8 S. W. 252); and we do not think the modification of the instruction was such prejudicial error as to require a reversal of the judgment.

3. The defendant asked the following instruction, which the court modified by striking out the phrase "and no other cause" and gave it as modified:

"The burden is upon the plaintiff to prove not only that the alleged assault of which he complains was com-

mitted under such circumstances as to render defendant responsible therefor, but the burden is upon the plaintiff also to establish by the evidence that his alleged injuries are the direct and natural result of such assault and of no other cause, and on this head the court instructs you that it is not sufficient for the plaintiff to prove that his present condition was possible or even probably due to the alleged assault. You must believe from the evidence that it is the result of such assault."

The instruction as asked is too broad. There is no evidence tending to show that defendant's old age contributed to but one of the weaknesses of which he complains as resulting from the injury, and if the defendant desired the benefit of this evidence it should have asked an instruction limiting this feature of the evidence to the particular weakness to which it contributed.

The defendant asked and the court refused the following instruction:

"The court instructs you that while plaintiff was riding as a passenger on defendant's car, it was his duty to deport himself in an orderly manner and in no way to interfere with the conductor's control and management of said car, and if you believe from the evidence that plaintiff did interfere with the conductors control or management of said car by seizing the bell rope or cord and pulling the same, and although requested by said conductor to desist from such interference, said plaintiff ignored such request and continued to hold onto and pull such rope or bell cord in defiance of said request of defendant's conductor, then said conductor in charge of said car had the right to remove plaintiff from such interference with his control and managemen of said car, and if in so removing plaintiff from the bell cord or rope and consequent interference with the control and management of said car, said conductor used no more force than was apparently necessary to so remove said plaintiff, and plaintiff because of such ef-

fort on the part of the conductor to so remove him from said rope or bell cord and conseqent interference with the control and management of said car, either struck or attempted to strike the conductor, then the conductor had a legal right to defend himself against such assault in whatever manner was apparently necessary to prevent plaintiff from doing him bodily harm, and if the jury find that the assualt complained of by the plaintiff occurred under the circumstances and in the manner above set forth, then the court instructs you that defendant St. Louis Transit Company is not responsible for the consequent injury to plaintiff, and your verdict must be for the defendant St. Louis Transit Company."

The instruction is faulty in that it leaves entirely out of view the conductor's evidence that after he was struck by plaintiff with the umbrella, he followed plaintiff into the street and continued the assault upon him when he was retreating from the car; this was not done by the conductor in his necessary self-defense. It is also erroneous in assuming that the conductor requested plaintiff to desist from pulling the bell rope. There is no evidence found in the record that any such request was made. We think, therefore, the court properly refused the instruction in the form in which it was presented. The answer alleged a good defense and there is some evidence tending to support it, or at least to greatly mitigate the damages; but the instructions asked by defendant, which were refused by the court, were all based on the theory that the difficulty on the car and the assault in the street were two separate and distinct difficulties and that the defendant was not liable for the assault made in the street. As we have seen (first paragraph opinion) that this is an erroneous view of the case, as shown by the evidence, we think all of defendant's refused instructions were properly refused.

4. It is insisted by defendant that the verdict is against the greater weight of the evidence. The evidence is conflicting; that of plaintiff tends to show that the

conductor made an unprovoked assault upon him; that of the defendant tends to show that plaintiff not only provoked but began the fight.   This conflict in the evidence was for the jury to settle and this court will not interfere with its findings, although it may appeal to it that the preponderance of the evidence is against the finging of the jury.   [Chitty v. Railroad, 166 Mo. 435, 65 S. W. 959; Redman v. Adams, 165 Mo. 60, 65 S. W. 300; Corrigan v. Kansas City, 93 Mo. App. 173.]

Discovering no reversible error in the record, the judgment is affirmed.   All concur.