REUBEN McQUERRY, Appellant, v. METROPOLI-
TAN STREET RAILWAY COMPANY, Respon-
dent.

**Kansas City Court of Appeals, February 5, 1906.**

1. **PASSENGER CARRIERS: Safe Carriage: Insurer: Passenger's
Duty.** A passenger carrier must protect his passengers against
assaults and this duty continues until the passenger has left
the vehicle in safety; and the carrier is the insurer against the
assaults of its servants, and where compelled to eject a pas-
senger must use no more force than is necessary; but the pas-
senger must conduct himself decently and in order, obeying
reasonable rules established for the benefit of the service and
the convenience of the passengers, and disobedience thereto
forfeits his contract of carriage.

2. ————: ————: **Smoking Regulation: Evidence.** The regula-
tion of a street car company prohibiting smoking in a
closed car is reasonable, and the passenger who persists in dis-
obedience thereto deserves expulsion; and the testimony shows
plaintiff's violation and impertinent conduct when asked to de-
sist and justified an order for him to leave the car.

3. ————: ————: **Pleading: Continuous Assault.** On plaintiff's
evidence the assault is held to be a continuous one, and that
by reason thereof the plaintiff did not alight in safety; and the
carrier's servant used unnecessary violence in removing him
from the car though he had forfeited his right to be carried
further.

4. ————: ————: ————: ————: **Instructions.** Defendant's evi-
dence held to present a situation radically different, and as the
petition was bottomed on a continuous assault an instruction
permitting a recovery for an assault after the ejecting of the
plaintiff from the car enlarged the scope of the cause of action
and was error as was the refusal of an instruction which con-
fined the recovery within the allegations of the petition.

5. ————: ————: ————: ————: ————: **Ellison, J., in Separate
Opinion.** When a passenger acts in absolute disregard of the
rules and customs of the company he becomes a trespasser and
the carrier's duty to him as a passenger ceases and its duty to
the other passengers begins, and it is no further an insurer of
his safe alighting from the car and is only required not to use
excessive force in ejecting him.

6. ———: ———: ———: ———: ———: Ellison, J., in separate opinion. On the plaintiff's evidence it is held that the assault of removing plaintiff from the car ceased after plaintiff crossed to the sidewalk and leaned against an electric pole and the conductor was standing on the back platform of the car; and the carrier was not liable for subsequent acts of the conductor by reason of its contract of carriage, and the carrier's only liability thereafter would arise by reason of the conductor's purpose, to have, in obedience to the carrier's instructions, the plaintiff arrested.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

AFFIRMED.

*Boyle, Guthrie & Smith* for appellant.

(1) The liability of a street railway company for the acts of its conductor in causing the arrest and prosecution of supposed offenders against the rights of the street car company is set forth in the case of Boden v. Transit Co., 108 Mo. App. 696. (2) So it is not the continuous existence of the relation or carrier and passenger which brings the acts of the conductor within his authority as a representative of the carrier, but the test is, is he doing an act in the line and of the nature of his general duties. Haehl v. Ry., 119 Mo. 325, 339; O'Brien v. Transit Co., 185 Mo. 263; Flynn v. Transit Co., 87 S. W. 560, 113 Mo. App. 185.

*John H. Lucas* and *Chas. A. Loomis* for respondent.

(1) The principle on which the master is held liable for the act of his servant has been well stated by Judge ELLISON in Eads v. Railway, 43 Mo. App. 536, l. c. 542-3. The price of a passenger's right to carriage, good treatment and protection by the carrier is not alone the money he pays, but is also his own good behavior. Breen v. Transit Company, 108 Mo. App. l. c. 452. (2) In-

McQuerry v. Railroad.

struction numbered six, for the appellant, ought not to have been given for the further reason that it was erroneous in that it incorrectly declared the law and was vicious in the abandonment of the issues tendered by the pleadings submitting a different cause of action from that alleged in the pleadings. Raming v. Ry., 157 Mo. l. c. 506.   (3)   What, then, is the rule of law governing the present question? Eads v. Railway, 43 Mo. App. 536, answers the question as fully as any authority that has come under our observation, and the answer vindicates the action of the trial court as fully as may be desired. Nellis on Street Railway Accident Law, page 149.   (4) The court did not err in granting the new trial, on account of the refusal to give instruction 10 as asked by respondent.   Peck v. Transit Co., 178 Mo. l. c. 625; Murray v. Transit Co., 176 Mo. l. c. 191; Campbell v. Railroad, 175 Mo. l. c. 181.

JOHNSON, J.—Action against a common carrier to recover damages alleged to have been sustained by a passenger as the result of the breach of the contract of carriage.   Plaintiff recovered judgment in the sum of one hundred dollars, actual, and twenty-five hundred dollars, punitive damages.   Motions for new trial and in arrest of judgment were filed by defendant and, upon hearing, sustained by the court on the ground that error had been committed "in giving plaintiff's instruction numbered 6 and in refusing defendant's instruction numbered 10."   The cause is here on plaintiff's appeal.

The petition charges: "That on or about the 2nd day of January, 1904, while the plaintiff was a passenger, having duly paid the usual compensation for carriage upon one of the lines of the said street railway of the defendant company, and at or near the corner of Main street and Missouri avenue in said city of Kansas City, the defendant, through its employees, the motorman and conductor in charge of such car, while in the dis-

117 App.—17

charge of their duties as servants of the defendant, violently assaulted, beat, bruised and wounded the plaintiff, striking and beating him with their fists and with metal objects, and driving him from said car, and knocking him down upon the streets of said city, and chasing him along and over the streets of said city, and finally, while he was fleeing from such assault and pursuit, shooting him in the lower part of the back with a revolver; that the ball from said revolver entered the plaintiff's body about one and one-half inches from the spinal column, just above the hip on the left side; that said ball is still in plaintiff's body and the doctors have been unable to extract the same; that as a result of said wounds so received, as aforesaid, the plaintiff suffers great bodily pain and mental anguish, and that his health is impaired, and that he is not capable of performing manual labor, as a result of said injuries, and that plaintiff is permanently injured on account of the matters and things above set forth, and has been damaged in the sum of ten thousand dollars.

"That such injuries so inflicted upon the plaintiff were inflicted violently, maliciously, wantonly, recklessly and oppressively, by reason of which the plaintiff should recover from the defendant the additional sum of ten thousand dollars as exemplary, punitive and vindictive damage."

The evidence introduced by plaintiff, consisting chiefly of his own testimony, discloses this state of facts: Plaintiff, a young man twenty-four years old, was employed as a cook in a restaurant near Fourth and Main streets in Kansas City. On the day of the occurrence in question, he quit work at 8 o'clock in the evening and went to his home in the southeast part of the city, arriving there at about 8:30 o'clock. His brother-in-law, with whom he lived, had left word for him to come to a certain saloon, some five or six blocks away, and plaintiff immediately repaired to the saloon, where he met his brother-in-law, and each took a drink of whiskey. After

remaining there a few minutes, they went to another saloon near Eighteenth street and Lydia avenue, where they played pool and occasionally drank beer until near twelve o'clock. They then concluded to go to another saloon near Fourth and Main streets, where plaintiff knew a bartender and, for that purpose, boarded a westbound car on defendant's Jackson avenue line. They paid their fare and all went well until they reached a point some two or three blocks away from their destination, when plaintiff, who was seated in the car near the front end, lighted a cigarette and began smoking. There were four or five other passengers in the car, one of them a woman. It was in the winter; the windows of the car were closed and plaintiff knew it was against the rules of the company for him to smoke in any part of the car except in the rear vestibule. The conductor approached, grabbed him by the shoulder and roughly said, "You will have to go in the vestibule with that." Plaintiff rejoined, "Which way is the vestibule?" though he knew where it was and kept on smoking, but says he was just starting to get up when the conductor struck him in the face. A fight ensued, blows were exchanged and the conductor was knocked down. In the meantime, the car was stopped near the corner of Fifth and Main streets and the motorman entered the melee at about the time the conductor was floored and dealt plaintiff a blow on the head with an iron instrument called a "sand punch." Plaintiff thereupon retreated to the rear end of the car, left it, walked eight or nine feet to the curbstone, looked around and saw the conductor armed with an iron switch rod in the act of jumping from the car for the purpose, as plaintiff thought, of renewing the affray. Plaintiff then ran first north on Main street to the corner and thence east to the alley with the conductor in hot pursuit. Finding his enemy was about to overtake him, plaintiff turned at bay just in time to ward off with his left arm a blow from the iron rod aimed at his head and retaliated with a blow from his fist, that landed upon

the conductor's face and felled him to the ground. Plaintiff then became the aggressor, but before he could inflict any injury to his prostrate foe, the latter succeeded in drawing a revolver from his pocket, seeing which, plaintiff took to his heels, but in his flight was shot in the back by the conductor and seriously injured.

The conductor testified that, when he discovered plaintiff was smoking in the car, he went up to him and in a courteous manner informed him that it was against the rules to smoke and requested him to go to the vestibule. Plaintiff rejoined, "Where is the vestibule?" The conductor replied, "It is out in the rear end of the car here." Plaintiff exclaimed, "Oh, I don't know." The conductor says plaintiff's manner was "mighty haughty" and he kept on smoking without making any show of compliance with the request. The conductor then said to him, "My friend, you will have to smoke out in the vestibule, if you want to smoke." Plaintiff continued smoking and the exasperated conductor knocked out the cigarette, whereupon plaintiff "rose right up fighting," knocked the conductor down and was engaged in pummeling him when the motorman came to the rescue, hit plaintiff with the sand punch and ordered him to "get off the car." Plaintiff immediately left the car and went to the sidewalk, where he stood for a few minutes. The conductor got up, looked for, and found his cap, and went to the rear vestibule with no thought of renewing the fight. It then occurred to him that it was his duty to have the plaintiff arrested and he proceeded to leave the car for the purpose of finding an officer. Plaintiff then started to run away, and, fearing that he might escape, the conductor entered into pursuit for the purpose of keeping plaintiff in sight until he could encounter an officer. Seeing that he was pursued, plaintiff suddenly stopped, turned and advanced upon the conductor, knocked him down, cut him in the face with a knife and was endeavoring to inflict further injury upon him when

the conductor drew his revolver and "took a shot" at plaintiff, who, in the meantime, had turned and fled.

The two instructions, which the court found were erroneously ruled upon, are as follows:

No. 6 given for plaintiff: "Even though you may believe from the evidence that the obligation of defendant to plaintiff as a passenger (if any) had terminated upon plaintiff's leaving said car, still if you believe from the evidence that after plaintiff had left said car the conductor of said car pursued the plaintiff for the purpose of arresting him because said conductor believed plaintiff had violated the law while on said car, and in such pursuit wrongfully shot plaintiff in the back, then if you further believe from the evidence that the conductor in so doing was acting within the scope of his employment as a servant of defendant, then the defendant is responsible for his wrongful acts (if any). In determining whether such wrongful acts (if any) of such conductor were committed within the scope of his employment, you are instructed the defendant is liable for all acts committed by such conductor while in the performance of the work entrusted to him, whether lawful or unlawful, which are within the scope of the authority conferred upon him either expressly or by fair implication, even though the specific act was not expressly authorized by defendant."

No. 10 asked by defendant, the giving of which was refused: "If you find from the evidence that plaintiff and defendant's trainmen had a fight on the car of defendant at the time and place in question, and that soon thereafter plaintiff got off of said car and ceased to be a passenger thereon, and after he got off of said car the conductor of defendant for the purpose of finding an officer to procure the arrest of plaintiff left the car and followed plaintiff, and after plaintiff and said conductor had gone some distance away from said car they had an altercation and said conductor shot plaintiff, then you are instructed that defendant is not responsible for

said shooting, and plaintiff cannot recover any damages therefor and your verdict will be for the defendant on that issue."

Not only is the duty upon the carrier to exercise the highest degree of care during the transportation of the passenger to protect him against assaults and outrages, whether offered by strangers or by the carrier's own servants, but that duty continues until the passenger has left the vehicle *in safety* at his destination. As to the acts of its servants, the duty of the carrier is that of an insurer. Its contract to carry safely implies an agreement for considerate and courteous treatment of the passenger by the carrier's servants. And if it becomes necessary for the carrier to eject the passenger before the end of his transportation, because of the misconduct of the latter, no more force must be employed than is required to accomplish the removal of the passenger from the car. If the carrier fails in the performance of any of these duties, it is liable to the passenger for any injury thereby sustained. On the other hand, the passenger is duty bound to conduct himself in a decent and orderly manner. He should observe and obey the reasonable rules established by the carrier for the benefit of its service or for the safety, convenience and comfort of its other passengers, and, if he refuses to do this, he forfeits his rights under the contract of carriage and subjects himself to removal from the car. [Eads v. Railway, 43 Mo. App. 536.]

It is not intimated, nor would the suggestion be entertained, that defendant's prohibition of smoking in its closed cars, which are used alike by all classes and conditions of people, is not a reasonable regulation. It is essentially for the comfort of the public and we do not hesitate in saying, as a matter of law, that a passenger who persists in disobeying it, after his attention is called to it, deserves expulsion from the car. Plaintiff's own testimony admits of no other construction than that he knowingly and deliberately violated this rule and was

McQuerry v. Railroad.

guilty of impertinent conduct after he had been asked to desist. Up to this point, plaintiff was clearly in the wrong and defendant's trainmen would have been justified in ordering him to leave the car and, had he refused, in employing force necessary to eject him.

But the conductor, instead of following this course, according to his own admission, became a wrongdoer himself. We do not mean to say that a conductor must degrade his manhood and tamely submit to gross insult, but in serving the public and in performing his master's contract to treat passengers with all due consideration, he is expected to exercise some degree of self-restraint and not to fly into a rage and misbehave at every impertinence from a passenger. His right and duty to eject a passenger on account of misconduct, not grossly insulting or offensive, does not justify him in assaulting the passenger unless the resistence of the latter during his removal is of a nature to make physical violence an imperative necessity. When the conductor, instead of ordering plaintiff to leave the car, employed physical violence, plaintiff then became the injured party; and was justified in defending himself and it does not appear that plaintiff used any more force than was required to free himself from his assailants. Defendant is liable for the wrongful acts of its agents and servants committed in the course and scope of their employment and, under the conceded facts, must be held liable for the damages from the unjustifiable, though not entirely unprovoked, assault of the conductor and motorman in the car.

According to the testimony of plaintiff, the conductor continued to be the wrongful aggressor after plaintiff left the car. His attack was continuous and persistent from the moment the first blow was struck until the shot was fired, for during that whole period he was actuated by the single purpose of inflicting immediate bodily injury upon plaintiff. The momentary pause that occurred while plaintiff was escaping from the car was not due to any relaxation in the conductor's purpose.

So that when plaintiff left the car he did not alight *in safety,* as defendant agreed he should, but in imminent danger from defendant's servant, the same danger, too, but of increased potentiality, that threatened him in the car. He did not know, nor is it believable under his version of the facts, that the conductor was following him, not for the purpose of renewing the fight, but to procure his arrest. The conductor overtook him, aimed a deadly blow at him and compelled him again to defend himself. From start to finish, the conductor, though twice defeated, kept after him with ferocious intent and finally brought him down with a shot from his revolver. We have here every element of a continuous assault and, as it began during the existence of the relation of carrier and passenger and appears as a consistent and indivisible whole, the fact that part of it occurred on the car and part in the street does not affect the relation between the parties. The whole affray is included within the exercise by the carrier of excessive violence in ejecting a passenger, who had forfeited his right to be carried further, but who yet retained the right not to be subjected to unnecessary violence in his removal from the car. [O'Brien v. Transit Co., 185 Mo. 263; Flynn v. Transit Co., 113 Mo. App. 185; 87 S. W. 560; Wise v. Railway, 91 Ky. 537.]

But the conductor's testimony presents a situation radically different from that just reviewed, and defendant was entitled to have its statement of the facts fairly submitted to the jury and to have the cause of action presented in the instructions confined within the limits of that pleaded in the petition. Plaintiff pleaded a continuous assault as the sole basis of his right to recover. The learned trial judge in giving plaintiff's instruction numbered 6 enlarged the scope of the cause of action pleaded and declined to correct the error when his attention was called to it by the asking of defendant's instruction numbered 10. The jury was thus directed to find for plaintiff, either under the hypothesis that the

assault was continuous or that two separate assaults were made, the first during the relation of carrier and passenger and the second after the termination of that relation.   The cause of action pleaded being based solely upon a tort committed by a carrier upon its passenger during the performance of the contract of carriage, a recovery should not have been permitted for another injury inflicted by the carrier through the hand of its servant after the act of ejecting plaintiff from the car had been fully accomplished.   According to the testimony of the conductor, the first fight was all over when plaintiff left the car and he was free to go his way.   He stood on the sidewalk  near the car and it was several minutes before the conductor started out to look for an officer. If this is true—and it was a question of fact for the jury —the duty of defendant to plaintiff as a carrier had ended before the conductor had renewed hostilities and, if the second fight resulted from the conductor's effort to perform a duty incident to his employment, that is, to procure the arrest of a disorderly passenger after the latter's expulsion from the car, defendant would be liable for the wrongful act of the servant committed in the discharge of that duty, but upon an entirely different principle from that applying to an assault made by the servant upon the passenger during his transportation.   One liability is founded upon the breach of the duty of an insurer, the other upon the breach of the duty one stranger owes another not to wrongfully injure him. Considering the state of the pleadings and the conflict in the testimony noted, plaintiff's right to recover should have been restricted to the finding that the assault was continuous.

We therefore conclude that the learned trial judge committed no error in granting defendant a new trial and the judgment sustaining the motion therefor is accordingly affirmed.  All concur.

ELLISON, J. (in separate opinion).—As stated by Judge JOHNSON, the plaintiff deliberately violated a proper and reasonable rule of the company and was impertinent when remonstrated with by the conductor. He testified that he knew he was "acting in absolute disregard of the rules and customs of the company." He thereby forfeited his right as a passenger and became a trespasser and the defendant's duty to him as a passenger ceased, and its duty to the public—to the other passengers—began. It was under no further duty as an insurer of a safe alighting of plaintiff. He testified that he started out that night to have "a time"—to have "a little fun;" and that he was drinking in several saloons and at time of the difficulty (about midnight) was on his way to another. It, therefore, may very well have been that the exigencies of the situation were such as to have compelled the defendant's servants to give him an unsafe alighting. The only obligation defendant was under to plaintiff was to use no more force than was reasonably necessary to put him off of the car, and it is from such standpoint that that branch of the case should be treated. The case of Eads v. Railway, 43 Mo. App. 536, like the one before us, was where the plaintiff's own testimony placed him in the position of having forfeited his rights as a passenger; while the case of O'Brien v. Transit Co., 185 Mo. 263, on the plaintiff's testimony, called for a consideration of his rights as a passenger.

It appears from plaintiff's testimony in this case, that when the fight in the car was over he walked to the platform or vestibule, got off, walked eight or nine feet to the sidewalk, where he stopped, turned around and leaned against an electric pole. He then saw the conductor standing on the back platform and when he had stood leaning against the pole for about a moment the conductor got off the car with the switch bar in his hand and he started to run. That the conductor pursued him to an alley where the second fight, ending with the shooting, occurred. It seems to me to be clear that when the

plaintiff left the car and crossed over to the sidewalk and there stopped, that all duty to be performed by the conductor for defendant in the line of his employment had ceased and defendant should not be held liable for anything done by the conductor thereafter; unless for the following consideration.

It appears from the testimony of the conductor that it was one of his duties to have a person arrested who conducted himself as he stated plaintiff did. And that in his getting off the car his purpose was to have an arrest made and that in pursuing plaintiff, as he ran, he was engaged in performing a duty to defendant. If he was, then defendant would be liable for any improper and unlawful performance of that duty. But, as the first difficulty was a distinct affair in the pursuit of one purpose and had ended; the second difficulty, in consequence of a different purpose, should be considered from the standpoint of that purpose.

In these suggestions, I have not considered whether plaintiff's petition covers such a case as I think the evidence makes.