ROLAND VAN HOEFFEN, Respondent, v. COLUMBIA TAXICAB COMPANY, Appellant.

St. Louis Court of Appeals, December 31, 1913.

1. **APPELLATE PRACTICE: Conclusiveness of Verdict.** A verdict on conflicting evidence is conclusive, on appeal.

2. **CARRIERS OF PASSENGERS: Taxicab Company.** A taxicab company following the business of transporting persons for hire and holding itself out to carry one and all is a common carrier of passengers, and is subject to all the liabilities of such a carrier.

3. ———: **Protection of Passengers: Duty of Carrier.** It is the duty of a carrier of passengers to protect passengers from insult and assault by its own servants and by outsiders; its obligation with respect to protecting him from insults and assaults at the hands of its own employees being that of an insurer.

4. ———: **Assault of Passenger: Right of Recovery: Authority of Chauffeur.** It is not essential to a recovery by a taxicab passenger, assaulted by and arrested on the request of a driver who had charge of the cab and was authorized to collect fares, that he show that the driver was acting within the scope of his authority, since the acts of the driver constituted a breach of the carrier's duty to protect the passenger against insults and assaults by its employees.

5. ———: ———: **Continuing Assault.** In cases of a continuing assault or restraint of liberty of a passenger by a servant of the carrier, initiated on or within the conveyance and continued after the passenger has alighted from it, the law will not undertake to determine whether the acts of the servant committed after the passenger had alighted were beyond the scope of his authority, but will treat the whole matter as having occurred while the passenger was under his care, so as to impose liability on the carrier for all such acts.

6. ———: ———: ———. Where the driver of a taxicab, who was in charge of the cab and authorized to collect fares, held a passenger prisoner in the cab for some time until he was finally able to force open the door and alight, and then caught and held him prisoner on the street, and caused him to be arrested and detained until an excessive fare was paid, the assault was a continuing one, beginning with the imprisonment in the cab.

7. ———: **Existence of Relation.** The rule, that the relation of carrier and passenger is ended when a carrier maintaining no station stops its vehicle and the passenger alights therefrom on a public street, is not applicable where the passenger is not permitted to remove his belongings from the vehicle or to depart therefrom free from insult or injury at the hands of the carrier's servants; and hence where the driver of a taxicab held a passenger prisoner in the cab for some time until he was finally able to force open the door and alight and then caught and held him prisoner on the street and caused him to be arrested and detained until an excessive fare was paid and refused to allow him to remove his grip from the cab, the relation of passenger and carrier existed during all that time.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench,* Judge.

AFFIRMED.

*Ryan & Thompson* for appellant.

(1) The demurrer to the evidence should have been sustained. Whether plaintiff was arrested ''while a passenger in and on one of defendant's cabs'' and said arrest was continued thereafter, or whether he was not arrested until after he had voluntarily alighted from said cab, in either event it was incumbent upon the plaintiff to prove that the chauffeur had authority from defendant to so arrest, and the evidence having shown expressly that he had no such authority, plaintiff was not entitled to recover. Grayson v. Transit Co., 100 Mo. App. 60; Dwyer v. Same, 108 Mo. App. 152. (2) Besides plaintiff will not be permitted to sue upon a cause of action arising out of alleged breach of duty growing out of the relation of carrier and passenger and recover for the violation of a duty growing out of the relation of master and servant. The distinction between the two causes of action is well marked and has been consistently observed by the appellate courts of this State. Raming v. Railroad, 157 Mo. 477; Farber v. Railroad, 116 Mo. 81; McPeak v. Railroad, 128 Mo. 617; Snyder v. Railroad, 60 Mo. 413; Keen v. Railroad, 129 Mo. App. 301; McDonald v. Railroad, 165 Mo. App. 75. (3) When the plaintiff, at his own suggestion and of his own volition, alighted from the cab in safety to the street, he thereupon ceased to be a passenger. Defendant's liability thereafter is to be determined by the law of master and servant and plaintiff does not seek to recover on the theory of the existence of that relation. Grayson v. Transit Co., 100 Mo. App. 73; McDonald v. Railroad, 165 Mo. App. 75;

179 App. 38

Nener v. Railroad, 143 Mo. App. 407-8; Senf v. Railroad, 112 Mo. App. 74; Ickenroth v. Transit Co., 102 Mo. App. 597; O'Brien v. Transit Co., 185 Mo. 263; McQuerry v. Railroad, 117 Mo. App. 255; Flynn v. Transit Co., 113 Mo. App. 185; Devoy v. Transit Co., 192 Mo. 210. (4) The defendant is not liable for the conduct of its servant who falsely arrests one not a passenger because such one refuses to pay his cab fare. A servant with authority to collect a debt has no authority to arrest the debtor for refusal to pay. Grayson v. Transit Co., 100 Mo. App. 73; Collette v. Revori, 107 Mo. App. 711; Milton v. Railroad, 193 Mo. 46; McDonald v. Railroad, 165 Mo. App. 108; Drolshagen v. Railroad, 186 Mo. 258; Farber v. Railroad, 32 Mo. App. 378, 116 Mo. 81; Krueger v. Railroad, 84 Mo. App. 358.

*Charles E. Morrow* for respondent.

(1) Plaintiff was first imprisoned in the taxicab. He thereafter alighted to the street, but was still held and imprisoned in the street by the side of the taxicab until his arrest was procured by a police officer. Plaintiff did not cease to be a passenger by alighting to the street where he was still imprisoned until his arrest was procured. It was a continuous transaction and defendant is liable for the actions of its servants on the principle of *respondeat superior.* Of course, it grows out of the relation of master and servant, but the duties of the servant to the passenger control in determining the scope of the authority of the servant. McDonald v. Railroad, 165 Mo. App. 107; Dwyer v. Transit Co., 108 Mo. App. 152; O'Brien v. Transit Co., 185 Mo. 263; Flynn v. Transit Co., 113 Mo. App. 185; McQuerry v. Railroad, 117 Mo. App. 255; Grayson v. Transit Co., 100 Mo. App. 60. The facts in this case show an abuse of the authority of the servants of defendant and not the lack of authority. Dwyer v. Tran-

sit Co., 180 Mo. App. 152; McDonald v. Railroad, 165 Mo. App. 107. (2) But even if plaintiff ceased to be a passenger when he alighted from the cab to the street defendant's servants having commenced the imprisonment while plaintiff was a passenger and continued it, the defendant is liable for all their acts as being within the scope of their authority. McDonald v. Railroad, 165 Mo. App. 107; Flynn v. Transit Co., 113 Mo. App. 185; McQuerry v. Railroad, 117 Mo. App. 255.

NORTONI, J.—This is a suit for damages said to have accrued to plaintiff through his alleged false arrest by defendant. Plaintiff recovered and defendant prosecutes the appeal.

The suit proceeds as if the relation of passenger and carrier obtained between the parties at the time of the grievance complained of, and the question for consideration pertains to that subject-matter.

It appears defendant is an incorporated company engaged in the business of operating taxicabs in the city of St. Louis for the accommodation and transportation of all persons who may apply to it to convey them from one point to another. It owns, maintains and operates about forty such conveyances, in which passengers are transported about the city for hire. Moreover, defendant maintains a number of stations at prominent points in the city, from whence transportation on one of its taxicabs may be had, or where one may be called into the service of a passenger. One of such stations is maintained by defendant at the Planters Hotel, and it was from this one that defendant undertook to transport plaintiff to his home at No. 858 McLaran avenue, St. Louis.

It appears plaintiff visited this station and inquired of defendant's chauffeur the fare to be paid for his carriage in a taxicab from that point to his home, at the number above mentioned. The chauffeur in

charge of the taxicab referred plaintiff to defendant's superintendent, who was stationed there in an office, for the information desired. Defendant's superintendent consulted the book, and besides remarking that the destination desired was 8400 north, stated the fare would be $3.70. Plaintiff accepted the proffer thus made and entered the cab for transportation. Besides the regular chauffeur on the taxicab, another man in uniform as a taxicab driver accompanied the chauffeur and rode on the seat with him. It is suggested by plaintiff that this extra man on the seat accompanied the chauffeur as a guard against impending assault from striking taxicab drivers, but this we regard as wholly immaterial to the issue made. At any rate, after having thus taken passage in defendant's conveyance, plaintiff was transported therein to within about a block from his residence, when it is said the taxicab became stalled or refused to proceed for some reason unknown to him. Thereupon plaintiff said to the chauffeur that he would pay his fare and walk from thence homeward, as it was but a short distance, and to this the chauffeur acceded. According to the evidence of plaintiff, he took from his pocket $3.70 while yet sitting in the taxicab and laid it on the seat on the box beside the chauffeur in settlement of the charge for transportation. The chauffeur did not accept the amount thus tendered, but looked at and read the meter on the conveyance and demanded five dollars for his transportation, saying such was the amount the meter registered as due, in accordance with the miles traveled. Plaintiff insisted that he had contracted in the presence of the chauffeur with defendant's superintendent for transportation home at the price of $3.70 and that this was all he would pay. Whereupon, it is said both defendant's chauffeur, whom the evidence shows to be authorized to collect fares for defendant, and his companion, took hold of the door on either side of the taxicab and imprisoned

plaintiff therein demanding that he should pay five dollars instead of $3.70.

It is said the two men, one stationed at either side of the cab, restrained plaintiff of his liberty and confined him therein for about one minute and rudely demanded that he should pay the five dollars so registered by the meter. After being thus restrained for about one minute, plaintiff says he opened the door of the taxicab and stepped out of the same upon the ground in the street, where defendant's chauffeur and his companion laid hold of him and restrained him for a considerable time, insisting that he should pay the five dollars demanded. Both the chauffeur and his companion, according to plaintiff's story, treated plaintiff rudely while thus standing beside the cab, held him fast by the arms, cursed and abused him and threatened to call a policeman. A considerable time was occupied in the argument while the parties stood beside the conveyance in the street, and plaintiff's grip, or hand bag, remained therein and a large number of people assembled there to view and witness the controversy. Plaintiff insisted that he owed but $3.70 and this he repeatedly offered to pay, while defendant's chauffeur insisted he should pay the five-dollar charge, and presently the chauffeur added an additional twenty cents for waiting time and then demanded $5.20 instead of five dollars as before. When about ten minutes had elapsed and the controversy still continued, defendant's chauffeur repaired to a near-by police station, leaving plaintiff in the meantime in charge of his companion, and enlisted the services of a policeman to enforce the payment of the five-dollar charge. Probably twenty minutes thereafter the policeman arrived with defendant's chauffeur and insisted that plaintiff should pay the amount charged by the chauffeur or accompany him to the station. Plaintiff declined to pay the bill and repeatedly tendered $3.70 instead. It is said the chauffeur insisted upon

the policeman aresting plaintiff and he did so. By this time a large number of the residents of the neighborhood had assembled at the scene and among them plaintiff's father and his sister. Plaintiff's father offered to pay the charge of $5.20 but plaintiff refused to permit him to do so, and stated that he had contracted with defendant for conveyance home for $3.70. Whereupon the chauffeur's companion and the police officer in charge of plaintiff, together with plaintiff's father and sister, all repaired to plaintiff's home, a block away, and entered the residence. Here it is said pliantiff's father paid the charge demanded by the chauffeur and the chauffeur's companion and the police officer departed.

The evidence on behalf of defendant is in many respects about the same as that for plaintiff. The principal discrepancy in the evidence on behalf of defendant and that for plaintiff pertains to the matter of the restraint laid upon plaintiff at the initiation of the controversy. Defendant's chauffeur and his companion deny that they restrained plaintiff of his liberty within the taxicab by holding the door on either side and preventing him from alighting therefrom. However, they admit the controversy which ensued in the public street by the side of the car over the collection of the fare, but say they did not lay hands on plaintiff there. But it was admitted, too, by defendant's chauffeur on the stand that he called the policeman and invoked his aid in collecting the fare and that his companion and the police officer accompanied plaintiff to his home where the father paid it. Defendant's superintendent says that he did not enter into a contract with plaintiff to transport him for $3.70, but when the inquiry was propounded to him touching the fare for the transportation, he consulted his book and, upon discovering the point of destination to be 8400 north, said the fare would be about $3.70, giving this amount as an estimate only. But be all of this as it may, the

jury found the issue for plaintiff as though $3.70 was the agreed price for the transportation, and that matter is thus concluded here.

Defendant is pursued as a common carrier, for that it breached its obligation to accord the passenger just and decorous treatment and protect him from insult and injury, while the relation of passenger and carrier obtained, in restraining plaintiff of his liberty within the conveyance and causing his arrest by a policeman immediately after alighting therefrom and before the fare was paid and in an endeavor to extort from plaintiff money not justly due it. It seems to be conceded on the part of defendant that it is a common carrier of passengers and was engaged in such calling at the time. But it is urged the court should have directed a verdict for it because there is no evidence tending to prove that, though its chauffeur restrained plaintiff of his liberty within the car and occasioned his arrest by the police officer immediately after alighting therefrom, such chauffeur was acting within the scope of his authority thereabout so as to entail liability upon defendant for his wrongful act. Obviously this argument is unsound, for if defendant is a common carrier of passengers and was engaged in that calling at the time, the chauffeur's authority to represent it in that behalf is to be declared as a conclusion of law on the facts in evidence. The case concedes that the chauffeur was authorized to collect fares from the passengers which defendant transported in its taxicabs and that such chauffeur was in charge of the conveyance.

The evidence is direct and positive to this effect. It appears defendant owned and operated forty taxicabs in the city of St. Louis and that it maintained stands or stations at prominent places throughout the city where transportation might be had in such taxicabs or they might be called into service where required. Defendant followed the business of transport-

ing persons for hire from one part of the city to another and held itself out to serve one and all who should apply to it for transportation upon the payment of the fares agreed upon or usually charged. This being true, it is, of course, a public or common carrier of passengers and through entering that calling assumed all of the obligations incident thereto. [See Hutchinson on Carriers (3 Ed.), secs. 37, 48, 49, 890; Babbitt on Motor Vehicles, secs. 620, 621; Parmelee v. Lowitz, 74 Ill. 116.] Upon entering the taxicab for transportation, plaintiff placed himself in the care and custody of defendant common carrier and defendant assumed toward him the obligation to conduct itself with proper decorum. Moreover, the relation thus established imposed the obligation on defendant carrier, not only to protect plaintiff from insult and assault by outsiders, but from its own servants as well. To this extent the passenger is entitled to the absolute protection of the carrier and to this extent the common carrier is an insurer of his safety and protection from such insults, assaults and humiliation at the hands of its servants. See Hutchinson on Carriers (3 Ed.), sec. 1093; O'Brien v. St. Louis Transit Co., 185 Mo. 263, 268, 84 S. W. 939; McQuerry v. Met. St. R. Co., 117 Mo. App. 255, 92 S. W. 912.] Touching this question, Judge Elliott says, in his splendid work on Railroads, Vol. 4 (2 Ed.), sec. 1638:

"A carrier is bound to discharge the implied duty, arising out of its contract and imposed by law, that its passengers shall be protected from injury by its servants and shall not be willfully insulted and harmed by them, and if it commits the discharge of this duty to an employee it may well be held to do so at its peril, notwithstanding the exercise and care on its part in selecting its servants. Either the company or the passengers must take the risk of the infirmities of temper, maliciousness and misconduct of the employee whom the company has placed upon the train and to

whom it has committed the discharge of its duty to protect and look after the safety of its passengers. A passenger has no control over them, and the company alone has the power to select and remove them. It is, therefore, but just to make the company, rather than the passengers, take the risk and hold it responsible."

It is, therefore, obvious that it is not essential to plaintiff's right to recover that he should show the chauffeur was authorized by defendant to restrain him of his liberty or to occasion his arrest by the policeman, so long as he was acting in the purview of his employment in charge of the taxicab and in and about the collection of the passenger's fare. This is true because defendant failed in its duty to protect plaintiff · from insult and injury at the hands of its own servants. [Keen v. St. Louis, I. M. & S. R. Co., 129 Mo. App. 301, 108 S. W. 1125.] It is conceded that the chauffeur had charge of the car and that it was his duty to collect the fares. This being true, the law concludes that the act of the chauffeur in restraining plaintiff of his liberty while within the cab and upon alighting therefrom and in calling a policeman to arrest him while standing beside the cab, all to the end of collecting the fare, was the act of defendant then and there being present in the person of the chauffeur. [Dwyer v. St. Louis Transit Co., 108 Mo. App. 152, 83 S. W. 303; Grayson v. St. Louis Transit Co., 100 Mo. App. 60, 71 S. W. 730.]

Moreover, it is obvious such must be true on the facts of the instant case, for, according to the evidence of plaintiff, the assault was a continuing one which commenced within the taxicab and continued in the street beside the conveyance thereafter. In restraining plaintiff's liberty within the cab and laying hands upon him to the end of collecting the fare upon his alighting therefrom and calling a police officer to effectuate his arrest, which was done, the chauffeur represented defendant beyond question, for the re-

straint of liberty first imposed within the cab was continued by the subsequent conduct until plaintiff's arrest by an officer was actually had. [See Dwyer v. St. Louis Transit Co., 108 Mo. App. 152, 83 S. W. 303; Grayson v. St. Louis Transit Co., 100 Mo. App. 60, 71 S. W. 730; O'Brien v. St. Louis Transit Co., 185 Mo. 263, 84 S. W. 939; Flynn v. St. Louis Transit Co., 113 Mo. App. 185, 87 S. W. 560; McQuerry v. Met. Street Ry. Co., 117 Mo. App. 255, 92 S. W. 912; Savannah Street, etc., Co. v. Bryan, 86 Ga. 312; Wise v. Covington, etc., Street Ry. Co., 91 Ky. 537.] In such cases of continuing assault or restraint of liberty, initiated on or within the conveyance, the law will not undertake to summarily determine a portion of the servant's conduct, even in the relation of master and servant, as beyond his authority, but rather remits the whole matter to be considered as at the beginning of the controversy and in the source of the servant's power. [See McDonald v. St. L. & S. F. R. Co., 165 Mo. App. 75, 146 S. W. 83; New Ellerslie Fishing Club v. Stewart, 123 Ky. 8, 93 S. W. 598, 9 L. R. A. (N. S.) 475.]

It is argued the court erred in instructions given for plaintiff and in refusing certain instructions requested by defendant, in that it omitted to recognize a distinction which it is said inheres in the case sufficient to acquit defendant of all liability for the acts of the chauffeur. This argument proceeds from the fact that defendant's evidence tends to prove that, though plaintiff was taken into custody by the police officer at the instance of the chauffeur, this all occurred in the street after plaintiff had alighted from the taxicab. It is urged that if such be true, no responsibility may be entailed on defendant for the wrongful act of the chauffeur, for the reason that plaintiff was not a passenger at the time and the controversy was solely one between plaintiff, a stranger to defendant, and its chauffeur. Both defendant's chauffeur and his com-

panion testify that they did not imprison plaintiff within the cab—that is to say they did not hold the doors and forbid plaintiff from alighting therefrom, as stated by him. Furthermore, these witnesses say they did not lay hands on plaintiff when he alighted from the cab into the street, but admit that they detained him there beside the cab in controversy about the fare and that defendant's chauffeur went after and brought a policeman who took plaintiff into custody. However, during all of this time plaintiff's grip, or hand bag, remained within the cab and the chauffeur forbade plaintiff to remove it. The chauffeur testified that, as the meter registered a five dollar charge, he would be called upon to make it good to defendant company if plaintiff did not do so.

Concerning the detention of plaintiff beside the cab in the street during the interim until the police officer arrived, the chauffeur testified as follows: "Q. You wanted also to see that Mr. Van Hoefen (plaintiff) didn't get away? A. I was going to see myself in the clear; I was not going to stand the bill. Q. You didn't intend to let him get away at that time? A. Not until I got my money." The chauffeur then says that upon arriving upon the scene with the officer, he called his attention to the meter. "Then the officer asked me if I wanted to have him arrested. I told him no; if he paid the bill I didn't care to have him arrested, and his father then, I believe, told this fellow that I had with me to come up to the house and he would settle it, and they went up to the house then."

It appears from all of the evidence that the policeman, after being called by the chauffeur and after an unsuccessful effort to induce plaintiff to pay the charge, took him into custody and accompanied him to his residence, where plaintiff's father paid the $5.20 demanded. If the relation of passenger and carrier continued between plaintiff and defendant at the time, there can be no question about the instructions given

in the case at the instance of plaintiff and those requested by, but refused to, defendant. It is urged by defendant that the relation of passenger and carrier terminates immediately upon the passenger's stepping from the conveyance upon the street and no doubt such is usually true, when nothing more appears. This is the general rule which obtains as to the termination of the relation when one alights at a proper place in the street from a street car, for that such carrier usually maintains no station there but rather discharges the passengers at appropriate places in the public thoroughfare. [Creamer v. West End Street Railway Co., 156 Mass. 320, 16 L. R. A. 490.] Generally speaking, it would seem for the same considerations that the taxicab should fall within the rule last above stated. But obviously such is not the rule which obtains in a case of the character of this one, for here a further necessity for the relation of the parties continued immediately at the place of the passenger's alighting. Moreover, defendant forbade plaintiff to remove his grip from the cab and there retained it in possession. The point at which the relation of passenger and carrier terminates is not identical in every case, for it essentially turns in a measure upon the facts and circumstances attending the different transactions. Then, too, besides the character and mode of conveyance, the injury complained of and how and where it was received, together with the particular transaction in process between the parties at the time, is to be considered.

Mr. Hutchinson, in treating of this question, says:

"As a general rule, it may be said that the relation of carrier and passenger does not cease with the arrival of the train at the passenger's destination, but continues until the passenger has had a reasonable time and opportunity to safely alight from the train at the place provided by the carrier for the discharge of passengers, and to leave the carrier's premises in

the customary manner." [Hutchinson on Carriers (3 Ed.), sec. 1016.]

Judge Elliott, in his work on Railroads, Vol. 4 (2 Ed.), sec. 1592, says:

"The general rule is that the relation of carrier and passenger does not terminate until the passenger has alighted from the train and left the place where passengers are discharged."

Touching the same question the Cyclopedia of Law and Procedure, Vol. 6, p. 542, says:

"After the passenger has departed from the car, and has had reasonable time and opportunity to avoid further danger from the operation of the car, *or further necessity of relation with the servants of the carrier,* he ceases to be a passenger and stands toward the carrier as one of the general public." (Italics are our own.)

In those cases involving transportation companies which maintain stations and discharge passengers thereat, the courts universally declare that the relation of passenger and carrier continues, not only until the carriage has arrived at the destination of the passenger, but until the passenger has safely alighted and at least moved away from the immediate vicinity of the conveyance. In such cases, it is said, having surrendered himself to the care and keep of the carrier, the passenger is entitled to the exercise of high care on its part to afford him a proper egress from the conveyance and into and through the carrier's station and unless such is afforded the relation of carrier and passenger continues and may be utilized to the end of compensating an injury suffered by the passenger because of such omission. [Chicago Terminal, etc., R. Co. v. Schmelling, 197 Ill. 619; Pennsylvania Co. v. McCaffrey, 173 Ill. 169; C. & A. R. Co. v. Tracey, 109 Ill. App. 563; King v. Central, etc., R. Co., 107 Ga. 754.] Such is the law, too, of this State with respect to the right of ingress and egress to and from the

trains of the carrier. [Fillingham v. St. Louis Transit Co., 102 Mo. App. 573, 77 S. W. 314; Robertson v. Wabash R. Co., 152 Mo. 382, 53 S. W. 1082; Reynolds v. St. Louis Southwestern R. Co., 162 Mo. App. 618, 142 S. W. 1097.]

But the precise obligation of the carrier involved here is that which assures to the passenger decorous treatment and protects him from insult and assault from the carrier while the relation continues. This obligation inures in favor of a passenger who has alighted from the train and while he yet remains for a reasonable time in the station house of the carrier. Until such a reasonable time has expired, the relation of carrier and passenger is said to continue. [See Houston v. Batcheler (Tex. Civil App.), 73 S. W. 981; 4 Elliott on Railroads (2 Ed.), sec. 1592; Hutchinson on Carriers (3 Ed.), sec. 1016.] So, too, is the passenger within the care and protection of the carrier not only until he has actually alighted from a conveyance, such as a street car, into the street, but is permitted to depart therefrom free from insult and injury at the hands of the defendant's servants in charge. Such, in substance, is the judgment of the court given in Flynn v. St. Louis Transit Co., 113 Mo. App. 185, 87 S. W. 560, for there, though the assault was first commenced on the car, it seems to have been renewed after the passenger alighted in the street. Upon the passenger's alighting in that case, he attempted to take up his umbrella, which remained on the platform of the car, and was kicked by the conductor. The court declared the relation of passenger and carried continued at the time. Here, the carrier forbade plaintiff his grip during the *melee* in the street.

Moreover, the authorities rule that if the passenger, after alighting from the conveyance, tarries about it in the transaction of business with the employees of the carrier, the relation of passenger and carrier continues the while; for instance, as where the pas-

senger is engaged in assisting the carrier's servant about unloading his baggage from the conveyance and loses his life from the starting of the locomotive. In such a case, the Supreme Court of Texas declared the relation of passenger and carrier continued to obtain and the carrier should respond thereon. [See Ormand v. Hayes, 60 Tex. 180. See, also, Burnham v. Wabash, etc., R. Co., 91 Mich. 523.] It is certain that the passenger has a right to pass from the conveyance at the end of his journey in safety—that is, free from the assaults of the carrier's servants. Therefore, it would seem the principle attending the obligation continues to afford protection to the passenger until the further necessity of relations with the servants of the carrier at and in the vicinity of its conveyance as by way of the settlement of the charge for the transportation is passed. [See 6 Cyc. 542; Hutchinson on Carriers (3 Ed.), sec. 1016; Elliott on Railroads (2 Ed.), sec. 1592.] Obviously the passenger may not be ruthlessly assaulted by the carrier's servant without liability on its part while in the very act of paying the charge of transportation, claiming his baggage and departing from the place at which he alighted, for until then the law protects him as within the care of the carrier. Though the journey is ended, the passenger is clearly within the protection of the carrier and the relation continues until the settlement of fare is made and he is permitted by the carrier to take his leave in peace.

In this view, it will be unnecessary to consider the instructions, and the judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Allen, J.,* concur.