[Crim. No. 434.   Second Appellate District.—November 4, 1915.]

In the Matter of the Application of H. G. LEE for a Writ of Habeas Corpus.

MUNICIPAL ORDINANCE—USE OF STREETS BY SELF-PROPELLED VEHICLES CARRYING PASSENGERS FOR HIRE—SERVICE DURING PRESCRIBED HOURS—REASONABLE REGULATION—POLICE POWER.—A provision of a municipal ordinance requiring the driver or operator of a self-propelled vehicle, other than a street-car, traversing the public streets between certain definite points or termini and carrying passengers for a fixed charge, to run and operate such vehicle, so as to maintain a regular schedule during prescribed hours, is a regulation made in the lawful exercise of the police power, and especially of the power to make reasonable regulations governing the use of the streets of the municipality.

APPLICATION for a Writ of Habeas Corpus originally made in the District Court of Appeal for the Second Appellate District.

The facts are stated in the opinion of the court.

Lane D. Webber, for Petitioner.

T. B. Cosgrove, City Attorney, and Sweet, Stearns & Forward, for Respondent.

Herbert N. Ellis, *Amicus Curiae.*

CONREY, P. J.—The petition herein sets forth that the petitioner is under arrest and in custody of the chief of police of the city of San Diego pursuant to a complaint charging him with violations of a penal ordinance of that city. The complaint, which was filed with a city justice of the peace, charges that the defendant has committed a misdemeanor as follows, to wit: "That the said defendant on or about the 31st day of August, 1915, in the city of San Diego, . . . being the lessee of and operating an auto bus, as defined in section 1 of Ordinance No. 6248 of the ordinances of said city, said auto bus being operated by virtue of a certain auto bus permit and license numbered 43, issued pursuant to the terms of said ordinance numbered 6248, did willfully and unlawfully on, to wit, the 31st day of August, A. D. 1915, and on the 1st day of September, A. D. 1915, and on the 2d day of September, A. D. 1915, fail, refuse and neglect to run and operate said auto bus so as to maintain a regular schedule from 6 o'clock A. M. to 12 o'clock midnight, daily, for at least six days in the week, beginning Monday, August 30th, A. D. 1915, and ending Monday, September 6, A. D. 1915, all of which is contrary," etc.

The ordinance No. 6248 is entitled, "An ordinance regulating the use of the streets of the city of San Diego, California, by self-propelled motor vehicles carrying passengers for hire, and providing for the licensing of such vehicles and for a penalty for the violation of this ordinance." So far as necessary to be set forth herein, the provisions of the ordinance are as follows: "Section 1. An 'auto bus' is hereby defined to be a self-propelled motor vehicle, other than a

street-car, traversing the public streets between certain definite points or termini and conveying passengers for a fixed charge of not more than ten cents between such and intermediate points, and so held out, advertised, or announced. An auto bus is hereby declared to be a common carrier and is subject to the regulations herein prescribed.'' As a prerequisite to the operation of an auto bus, the owner or lessee thereof is required to obtain a permit therefor. Written application must be made for an auto bus permit, and the application is required to state, among other things : '' (a) The route or routes proposed to be followed in transporting passengers, and the termini of said route or routes.'' . . . '' (c) The schedule to be observed, showing the times of departure from the termini according to which it is proposed to operate such auto bus.'' Section 19 is as follows: *''It shall be unlawful* for any person driving any such auto bus, and holding himself out to carry passengers for hire from point to point, *to drive or operate such auto bus* for hire over a route, or between the termini, or *according to a schedule other than the* route, termini or *schedule described in the license,* or to deviate from such route, or fail to maintain such schedule, or to fail, refuse or neglect after commencing any trip to operate such auto bus between the termini and over the entire route or routes specified in the license and mentioned in the sign herein provided to be carried by each auto bus, unless the failure to complete such trip shall be the result of accident, or the breaking down of the auto bus or the engine thereof; provided, however, that such persons may transfer passengers to any other auto bus used to complete such route as herein provided, only a single fare being charged, however, for the entire trip between such specified termini, and provided always, however, that nothing herein contained shall be construed as prohibiting the owner of auto buses from operating the same at times and over routes other than the times and routes mentioned in their schedule, and charge such fare for hire as may be agreed upon between the owners of such auto buses and the passengers therein.''

Section 3-a reads as follows: ''In order that adequate transportation facilities may be furnished to the public, each and every auto bus for the operation of which a permit is issued under the provisions of this ordinance, shall be so run and operated as to maintain a regular schedule from 6 A. M. to 12 midnight daily, for at least six days each week and

28 Cal. App.—46

such schedule shall be so arranged as to provide that such auto bus shall leave from each terminus of its route at stated intervals during the whole of such period from 6 A. M. to 12 midnight of each day for at least six days in each week. That the intervals of departure from each such terminus shall be so fixed as to allow such auto bus sufficient time to safely traverse the distance between such termini and to remain at each terminus for the purpose of receiving and discharging passengers not longer than thirty minutes between each trip.'' Under section 26 the violation of any of the provisions of the ordinance is declared to be a misdemeanor for which certain penalties of fine or imprisonment or both are provided.

The petitioner alleges ''that the particular section of said Ordinance No. 6248 with which petitioner believes himself to be charged with violating is section 19 of said ordinance; that the said ordinance, and the said section 19 thereof, with violation of which said H. G. Lee is charged, are unconstitutional, invalid, void and of no force and effect because the said Ordinance No. 6248, and said section 19 thereof, are unreasonable, oppressive, destructive and unfairly discriminate against your petitioner, said H. G. Lee, and the persons and things by it sought to be regulated.'' From the agreed statement of facts herein, which substantially is offered as the return to the writ, it appears that ordinance 6248 was adopted and approved in the early part of July, 1915, and section 3-a was added thereto by amendment approved August 28, 1915; that on or about August 2, 1915, acting under the provisions of said ordinance, the petitioner filed an application for an auto bus permit, gave the bond required by the ordinance, and on August 9th a permit was duly granted licensing petitioner to drive and operate an auto bus in the city of San Diego, and he paid the license fee required by the ordinance. In his application for a permit petitioner specified the route over and upon which he proposed to operate his said auto bus and the termini of such route, which said route is specified in said application to be from Fifth and ''E'' streets in said city, to University Avenue. In the operation of his said auto bus petitioner did, on the day or days alleged in the complaint for his arrest, for three consecutive days fail and neglect to so operate his said auto bus as to maintain a regular schedule for eighteen hours each day, as stated in said complaint.

Without making a detailed statement of the pertinent provisions of the constitution of the state and of the charter of the city of San Diego, this decision will assume that the city is vested with ample police powers, coextensive with the police power of the state, so far as municipal affairs are concerned; that the city's powers of control over streets include the power to regulate and to license vehicles using the streets for the carriage of passengers; and that it may make it a misdemeanor to carry on the business of carrying passengers on the city streets without a license.   Referring to a similar ordinance of San Francisco, the supreme court of California said that in regulating the use of its streets the city ''may classify vehicles for the purpose of regulation in such manner as is reasonable, in view of the character and manner of use and the danger to the public to be apprehended, . . . It may well be that the board of supervisors concluded that . . . special regulations as to condition of car, competency and fitness of operator, and the operation of the car, as well as security to protect against improper or negligent operation, were essential to the public safety.''   (*In re Cardinal*, 170 Cal. 519, [150 Pac. 348].)

As the record presented herein fails to show that the petitioner was prosecuted for a violation of any provision contained in section 19 of the ordinance, we need not consider his objections to the validity of that section.   The complaint against him charged him with failure to operate his auto bus according to a schedule which is the schedule required by section 3-a. Nevertheless, he may have been operating according to the schedule described in his license as required by section 19. The principal question for determination, therefore, is whether the provision of the ordinance which requires a licensed auto bus to be operated eighteen hours per day is a regulation made in the lawful exercise of the police power, and especially of the power to make reasonable regulations governing the use of the streets.

In *Ex parte Sullivan* (decided May 5, 1915, (Tex. Cr.), 178 S. W. 537), the petitioner was convicted upon a charge that he violated an ordinance of the city of Ft. Worth in the state of Texas, regulating motor buses of the class commonly called ''jitneys,'' in that he operated such vehicle without the license required by that ordinance.   The decision covers many points of objection to the ordinance, including a question identical with that at issue herein.   The court said: ''Again, the appli-

cant attacks those provisions, in effect, requiring him to select a given route over which he will run his motor bus, jitney, designating the termini, and requiring him to stick to that route and termini, and prohibiting him from operating elsewhere and requiring him to run, or cause to be run, his jitney for not less than 12 consecutive hours out of every 24, except," etc. . . . "The ordinance on this subject, it seems to us, instead of being unreasonable, is most reasonable, and permits them at any time to apply to the city for a change in their route or termini, and the ordinance provides that the city, in its discretion, can make such desired change. The agreed facts show that the jitneys now operate an average of 15 hours each day. Surely that they should be required by the ordinance to operate, with the exceptions mentioned, 12 hours is not unreasonable and violates no law. It seems to us that the ordinance makes every exception in this regard that would be either necessary or proper." In *Greene* v. *City of San Antonio* (decided June 9, 1915; (Tex. Civ.), 178 S. W. 6), the plaintiff sought to restrain the enforcement of a certain ordinance regulating the operation of vehicles using the streets of San Antonio for local street transportation. The court said: "It has been held time and again that cities have the authority to regulate or even to prohibit the prosecution of a private business on a street, and that such business cannot be engaged in lawfully without a grant of some character from the government. Whether the grant be denominated a franchise, a license, or a privilege would not matter, for the distinction is one in name and not in substance. (Dillon on Municipal Corporations, sec. 1210, and notes.) The author cited defines a franchise—'to be a particular privilege which does not belong to the individual or corporation as of right, but is conferred by a sovereign or government upon, and vested in individuals or corporations.' The right to solicit passengers and convey them for hire from one part of the city to another, as appellant does, is a privilege, a right, or a power, which he cannot exercise as of right, but its lawful existence must depend upon a grant whose character will not be changed by calling it a franchise, a privilege, or a license. The rights given could, with perfect propriety be named a franchise." The ordinance was sustained and in the course of its discussion the court further said: "The city is duly authorized by its charter to grant fran-

chises for the use of the streets and public places for public
purposes alone, and were appellant not engaged in the public
service of transporting passengers, the city would not be au-
thorized to license his automobiles to carry passengers for
hire.    There can be no difference in granting a franchise to
run cars on steel rails and to run them on the street surface.
There can be no more reason for not exercising the same con-
trol over automobiles engaged in transporting passengers for
pay than in supervising and controlling vehicles that can only
move on metal rails.    In fact there is a greater inconvenience
to traffic on the streets and more danger of accidents from
numbers of automobiles dashing along at a high rate of speed
in the hot quest for nickels than in cars confined to certain
well-defined tracks.    The ordinance does not indicate any de-
sire upon the part of the city government to destroy or un-
necessarily hamper the new mode of transportation, but it is
merely exercising that regulation of it which experience has
demonstrated must be applied to any individual or corporation
serving the general public.    Appellant's business is that of
a common carrier, subject to the same liability and under the
same obligations to the public as any other common carrier.
(Babbit on Motor Vehicles, secs. 620, 621; *Van Hoeffen* v.
*Columbia Taxicab Co.*, 179 Mo. App. 591, [162 S. W. 694].) ''
In *Ex parte Dickey,* a West Virginia case (decided June 22,
1915, 85 S. E. 781), the petitioner appears to have been con-
victed upon a charge that he violated an ordinance regulating,
licensing and taxing vehicles of the class known as ''jitney
buses,'' by conducting a motor bus business on the streets of
Huntington without the license required by the ordinance.
The validity of the ordinance was sustained.    This decision
also passed upon a provision requiring the licensee to main-
tain the service during prescribed hours.    The court said:
''Cabs, hackney coaches, omnibuses, taxicabs, and hacks, when
unnecessarily numerous, interfere with ordinary traffic and
travel and obstruct them.    Prescription of routes or places
of business for them is a fair, reasonable, and efficacious means
of preventing such results.    *Nor is it unreasonable to require
them to maintain the service during prescribed hours.*    They
are engaged in a public service which the legislature may al-
ways regulate.''    Many of the decisions relied upon by the
petitioner are instances of unreasonable regulation of harm-
less and useful employments located upon private property

and not conducted in the exercise of rights which include the use of public property. This involves a distinction which is well pointed out by the supreme court of appeals of West Virginia in the case of *Ex parte Dickey* (W. Va.), 85 S. E. 781, wherein the court also said: "As regards legislative power or control, the business or interest regulated by the ordinance is clearly distinguishable from vocations, the pursuit of which does not involve the use of public property. The right of a citizen to pursue any of the ordinary vocations, on his own property and with his own means, can neither be denied nor unduly abridged by the legislature, for the preservation of such right is the principal purpose of the constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic evils, such as gaming, the liquor traffic, and numerous others. To this list may be added such useful occupations as may, under certain circumstances, become public or private nuisances, because offensive and dangerous to health. All these fall within the broad power of prohibition or suppression, some wholly and absolutely and others conditionally. Such pursuits as agriculture, merchandising, manufacturing, and industrial trades cannot be dealt with at will by the legislature. As to them, the power of regulation is comparatively slight, when they are conducted and carried on upon private property and with private means. But when a citizen claims a private right in public property, such as a street or park, a different situation is presented. Such properties are devoted primarily to general and public, not special or private, uses, and they fall within almost plenary legislative power and control. In them, all citizens have the usual and ordinary rights in an equal degree and to an equal extent. In the regulation thereof, the legislature cannot discriminate. But, as regards unusual and extraordinary rights respecting the public properties, its power of control and regulation is much more extensive. Such rights are in the nature of concessions by the public, wherefore the legislature may give or withhold them at its pleasure. It may give them for some purposes and withhold them for others, and, in the case of those given, it may, upon considerations of character, quality, and circumstances, discriminate, permitting some things of a general class or nature to be done and refusing to

permit others of the same general class to be done, or extend-
ing the privilege to some persons and denying it to others be-
cause of differences of character or capacity.   The right of a
citizen to travel upon the highway and transport his property
thereon, in the ordinary course of life and business, differs
radically and obviously from that of one who makes the high-
way his place of business and uses it for private gain, in the
running of a stage coach or omnibus.   The former is the usual
and ordinary right of a citizen, a common right, a right com-
mon to all, while the latter is special, unusual, and extra-
ordinary.   As to the former, the extent of legislative power
is that of regulation; but, as to the latter, its power is broader,
the right may be wholly denied, or it may be permitted to
some and denied to others, because of its extraordinary na-
ture.   This distinction, elementary and fundamental in char-
acter, is recognized by all the authorities.''

The regulations contained in these ordinances are referable
to that governmental power commonly known as the police
power.   ''The police power is not subject to any definite limi-
tations, but is coextensive with the necessities of the case and
the safeguard of the public interests.''   (*Camfield* v. *United
States,* 167 U. S. 518, [42 L. Ed. 260, 17 Sup. Ct. Rep. 864].)
''It may be said in a general way that the police power ex-
tends to all the great public needs. . . . It may be put forth
in aid of what is sanctioned by usage, or held by prevailing
morality or strong and preponderant opinion to be greatly
and immediately necessary to the public welfare.''   (*Noble
State Bank* v. *Haskell,* 219 U. S. 104, [Ann. Cas. 1912A, 487,
32 L. R. A. (N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. Rep.
186].)   ''Another vital principle is that, except as restrained
by its own fundamental law, or by the supreme law of the
land, a state possesses all legislative power consistent with a
republican form of government; therefore, each state, when
not thus restrained and so far as this court is concerned, may,
by legislation, provide . . . for the common good, as involved
in the well-being, peace, happiness, and prosperity of the
people.''   (*Halter* v. *Nebraska,* 205 U. S. 34, 40, [10 Ann.
Cas. 525, 51 L. Ed. 696, 27 Sup. Ct. Rep. 419].)   Quoting the
words of Chief Justice Shaw in *Commonwealth* v. *Tewks-
bury,* 11 Met. (Mass.) 55, the supreme court of California
(*Parker* v. *Otis,* 130 Cal. 322, [92 Am. St. Rep. 56, 62 Pac.
571, 927]) said: ''All property in this commonwealth is . . .

held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall- prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient.''

The foregoing citations are sufficient to show that the trend of opinion is wholly in favor of supporting the validity of the class of ordinances here questioned, and the reasons are sufficiently indicated in the quotations made. Our conclusion is that the objections urged against this ordinance of the city of San Diego should not be sustained.

Special objection is further made that section 3-a of the ordinance, which was added thereto by amendment approved August 28, 1915, was not in force on August 31st, September 1st and 2d, 1915, the dates of alleged violation of the ordinance by the petitioner. This claim is based upon the fact that, in accordance with the provisions of article I, chapter IV, section 3, of the charter of the city of San Diego, no ordinance can go into effect for thirty days after its passage, unless the same be one relating to street improvement, or having for its purpose the preservation of the peace, health, or safety of the public. The amendatory ordinance itself declares that it is an ordinance for the immediate preservation of the public peace, health, and safety and one of urgency, ''and shall take effect and be in force from and after its passage and approval.'' The ordinance proceeds to set forth a recital of facts concerning the inadequacy of the regulations provided by the ordinance without such amendment, and the failure thereof without such amendment to afford immediate protection to the public safety and adequate and proper facilities to the traveling public. Conceding that the determination of whether or not an ordinance is properly an emergency measure and whether or not the facts upon which the emergency is claimed constitute an emergency, is subject to review by the court, we find no sufficient reason for setting aside the determination of that matter as made by the city council.

The writ is discharged and the petitioner remanded to custody.

James, J., and Shaw, J., concurred.